[Cite as *State v. Kennedy*, 2013-Ohio-4243.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

STATE OF OHIO

     Plaintiff-Appellee

v.

PATRICK L. KENNEDY

     Defendant-Appellant


Appellate Case No.    25283

Trial Court Case No.   2011-CR-231

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

## O P I N I O N

Rendered on the 27th day of September, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by CARLEY J. INGRAM, Atty. Reg. #0020084, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, 120 West Second Street, Suite 400, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

## I.  Introduction

{¶ 1}    Appellant, Patrick Kennedy, seeks reversal of his convictions and prison sentence of 15 years to life for convictions for two counts of Rape of a child less than ten years of age and three counts of Gross Sexual Imposition involving children less than 13 years of age. Kennedy claims that the trial court erred when it overruled his second motion to suppress his confession and his motion to withdraw his pleas of no contest.  We overrule Kennedy's assignments of error and affirm the trial court judgment.

## II.  Facts and Course of Proceedings

### A.  The Suppression Hearing

{¶ 2}    Officer John Garrison arrived at Children's Medical Center on January 17, 2011, at around 6:00 p.m., on report of a sexual assault.  After arriving, Garrison learned that a nine-year-old child, "J.," had told her mother and hospital personnel words to the effect that Patrick Kennedy had sexually assaulted her.  Kennedy was a family friend and babysitter who had accompanied J. and her mother to the hospital.  While Kennedy sat in the waiting room, Officer Garrison and his supervisor, Sergeant Clark, told Kennedy that although he was not under arrest, he was going to be detained in connection with a complaint of sexual assault. The officers then handcuffed Kennedy and placed him in a police car.

{¶ 3}    When Detective Jerome Dix arrived, he learned that J. had told social worker, Monica Ascar, that Kennedy babysat J. and her female cousins at his apartment.  J. also said that

several times over the past couple of years, Kennedy had placed his hands on the bare skin surrounding her vaginal area and on her bare chest. J. had seen Kennedy do the same thing to her cousins.

{¶ 4} In addition, J's mother, "W.," told Dix that she found out about the abuse from her sister after one of J's cousins told her mother about what Kennedy had done. Upon hearing this, W. asked J. if this was true, and J. said that it was.

{¶ 5} Kennedy was placed under arrest at around 8:30 p.m., and was taken to an interview room at the police department. After concluding his interview of J., Detective Dix then met with Kennedy at 10:00 p.m. Detective Bill Swisher was also present.

{¶ 6} The interview room was slightly more than six by nine feet, with a desk and three chairs to comfortably accommodate three people. Detective Dix was told that Kennedy had been offered something to drink and a restroom break before and during the interview. Both officers were also in plain clothes and neither was armed. Dix began the interview by informing Kennedy that he had been accused of a crime and stated that accusations and the truth can be different things.

{¶ 7} Detective Dix advised Kennedy of each of his *Miranda* rights verbatim, using a pre-interview form that listed the crime under investigation as Rape. When Dix asked Kenney whether he understood each right, Kennedy verbally acknowledged that he understood and placed his initials next to each right. Kennedy said he was a high school graduate and college student. He denied being under the influence of drugs or alcohol and spoke coherently and appropriately, having no apparent difficulty understanding or answering questions. When Kennedy was asked to read the waiver out loud, he stumbled only on the word "coercion," which Detective Dix

explained to him as pressure. Dix told Kennedy that he intended to have a friendly, voluntary conversation to discuss the situation and wanted to give Kennedy an opportunity to tell his side of the story.

{¶ 8} After acknowledging his understanding of the waiver portion of the form, Kennedy agreed to speak with the detectives and signed the form. The interview lasted one hour and fifteen minutes. Kennedy eventually admitted performing repeated oral sexual acts upon J. and her cousin, "P.," over the course of about a year. Kennedy first made the admissions verbally. Then, the detectives left Kennedy in the room alone while he hand-wrote a confession.

{¶ 9} After the detectives returned to the room, the tone of the conversation escalated briefly. Kennedy became upset and asked the detectives to stop the interview.

{¶ 10} Following the interview, Kennedy was indicted on two counts of Rape of a child under the age of ten. Subsequently, he was re-indicted, with the addition of seven counts of Rape under the age of ten and fourteen counts of Gross Sexual Imposition of a person under the age of thirteen.

### B. Motion to Withdraw Pleas Hearing

{¶ 11} Attorney David Stenson, who was appointed, negotiated a plea bargain. Kennedy entered a plea of no contest to two counts of Rape and three counts of Gross Sexual Imposition. In exchange, the State dismissed seven counts of Rape and 11 counts of Gross Sexual Imposition. The State and Kennedy agreed to an aggregate prison sentence of 15 years to life. The trial court then ordered a pre-sentence investigation.

{¶ 12} Prior to sentencing, Kennedy filed a motion to withdraw his plea with newly-appointed counsel. In his affidavit in support of the motion, Kennedy stated that he: (1) felt pressured by his attorney to accept the plea offer; (2) felt that counsel believed he was guilty; (3) did not believe that counsel had his best interest at heart; and (4) felt like he had been scared into taking the deal.

{¶ 13} At the hearing on the motion to withdraw, Kennedy testified about the claims contained in his affidavit. According to Kennedy, Detective Dix had lied to him and had pressured him into confessing to numerous crimes that he had not committed. On cross-examination, however, Kennedy admitted that Mr. Stenson was concerned with his chances of success at trial and the very real possibility that if he were convicted, he would spend the rest of his life in prison. Kennedy agreed that Mr. Stenson had reviewed the plea form with him before they came into court, and that Kennedy had informed the court that his pleas were voluntary.

{¶ 14} Attorney Stenson testified that he did not pressure Kennedy into entering a plea. Stenson stated that he had encouraged Kennedy to enter a plea based on the likelihood of a conviction, but left the decision to Kennedy. Stenson further said that he was comfortable going to trial, after having spent more than 20 years practicing criminal law.

{¶ 15} Stenson also testified that he had been actively preparing for trial prior to Kennedy's decision to change his plea. Stenson described his five to seven meetings with Kennedy, his personal review of discovery, and Kennedy's additional knowledge of the discovery from working with his prior attorneys. Stenson met with prosecutors, examined exhibits, and was negotiating possible stipulations.

{¶ 16}    Stenson additionally met with Kennedy for 25-30 minutes at the courthouse and reviewed the plea form.  Attorney Stenson told Kennedy that he thought it was in his best interest to accept the plea offer, but also said that if Kennedy wanted a trial, he was prepared.

{¶ 17}    Furthermore, Attorney Stenson told Kennedy that he thought Kennedy's defense was weak.  Without additional facts or witnesses, the only defense remaining was to advocate that the victims and their mothers were lying, that Kennedy, himself, had lied when he confessed, and that, while some of the victims had contracted chlamydia, the same sexually transmitted disease as Kennedy had, that someone else had given the disease to the victims.

{¶ 18}    Deputy Elizabeth Jerome also testified at the hearing.  Jerome was the deputy who had transported Kennedy to court on the day of the plea.  Jerome testified that she overheard Mr. Stenson tell Kennedy that he would take the case to trial. She heard Kennedy answer that he did not want a trial.  In addition, Jerome heard Kennedy admit to sexual activity with the girls consistent with what J. had accused him of doing.

{¶ 19}    After hearing the evidence, the trial court overruled Kennedy's motion to withdraw his pleas.   Kennedy appeals from his convictions and sentences for two counts of Rape and three counts of Gross Sexual Imposition.

III.   Did the Trial Court Err in Overruling the Motion to Suppress?

{¶ 20}    Kennedy's First Assignment of Error is as follows:

The trial court erred in overruling Kennedy's motion to suppress.

{¶ 21}    Under this assignment of error, Kennedy claims that his statements are the product of coercive police conduct in the form of overreaching, promises of leniency, and flattery

of hope.  Kennedy cites the following examples, paraphrasing in part:

You don't want to be presented as a monster.  These kids aren't liars. Do you wanna hurt these kids?  Six kids have the same story.  Motion to Suppress Interview Video, 19:06.

Don't hurt the victims more.  Let them have peace.  *Id*. at 21:08.

Why would they lie?  They love you.  They don't want you to continue to lie.  A jury will bury you.  *Id*. at 24:00.

Don't you want help?  *Id*. at 27:40.

Give the victims peace.  *Id*. at 28:05.

What happened in your childhood to make you do this?  Maybe you should have got counseling.  Let them be free.  Let them heal.  Don't make us go back to them and tell them they have to get on the stand.  Let them know you are sorry.  You don't want them acting out.  *Id*. at 43:00-46:00.

(Mr. Kennedy):  Can I get counseling?  (Detective Dix):  Yes, there are plenty of systems to get help.  *Id*. at   45:00-46:00.

**{¶ 22}**    We recently summarized the law governing *Miranda* waivers and voluntariness in *State v. Strickland*, 2d Dist. Montgomery No. 25545, 2013-Ohio-2768, as follows:

"The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee that no person in any criminal case shall be compelled to be a witness against himself."  *State v. Jackson*, 2d Dist. Greene No. 02CA0001, 2002-Ohio-4680, ¶ 19.  "A suspect may waive his constitutional right against self-incrimination, provided that waiver is voluntary.

A suspect's decision to waive his privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." (Citations omitted). *Id*. at ¶ 20.

"The issues of whether a confession is voluntary, and whether a suspect has been subjected to custodial interrogation so as to require Miranda warnings, are analytically separate issues." (Citations omitted). *Id*. at ¶ 21. "The due process clause continues to require an inquiry, separate from custody considerations, concerning whether a defendant's will was overborne by the circumstances surrounding the giving of his confession." (Citations omitted). *Id*. "This due process test takes into consideration the totality of all the surrounding facts and circumstances, including the characteristics of the accused and the details of the interrogation." *Id*. "Factors to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threats or inducements." (Citation omitted). *Id*.

"[A] confession may be involuntary and subject to exclusion if on the totality of the circumstances the defendant's will was overborne by the circumstances surrounding the giving of that confession." (Citation omitted). *Id*. at ¶ 22. "If all of the attendant circumstances indicate that the confession was coerced or compelled, it cannot be used to convict the defendant. That

determination depends upon a weighing of the pressure to confess against the power of resistance of the person confessing." *Id.* *Strickland* at ¶ 9-11.

### A. *Miranda*

**{¶ 23}** The trial court concluded that Kennedy voluntarily, knowingly, and intelligently waived his *Miranda* rights after the detectives explained the rights and Kennedy acknowledged that he understood his rights. We agree.

**{¶ 24}** The tone of the conversations between the detectives and Kennedy was cordial until shortly before Kennedy terminated the interview. Kennedy told the detectives he was a college student. He also had prior experience with the criminal justice system and was familiar with *Miranda* rights. Kennedy was not under the influence of drugs or alcohol. In addition, Kennedy was informed by Detective Dix that he had been accused of rape prior to waiving his rights, and this accusation was written on the form. Furthermore, after Dix read Kennedy each of the rights, Kennedy verbally indicated that he understood, and he then initialed the form after each right as another indication of his understanding. Kennedy read the waiver portion aloud, indicated he understood his rights, and expressed his willingness to waive his rights and speak with the detectives.

**{¶ 25}** There is no indication of coercion, or that Kennedy's will was overborne, or that his capacity for self-determination was critically impaired because of coercive police conduct.

### B. Voluntariness

**{¶ 26}** Kennedy claims that his confessions were involuntary due to coercion in the form of promises of "leniency or benefit." *State v. Arrington*, 14 Ohio App.3d 111, 470 N.E.2d

211 (6th Dist.1984), paragraph two of the syllabus. Kennedy notes that this court has recognized that "[p]romises or suggestions of leniency in exchange for waiving the Fifth Amendment privilege create a *flattery of hope*, which is made even more powerful by the *torture of fear* that accompany threats of punishment induced in the mind of the accused." (Emphasis sic.) *State v. Petitjean*, 140 Ohio App. 3d 517, 528, 748 N.E.2d 133 (2d Dist.2000).

{¶ 27} Although there are cases where false promises of leniency can be coercive when leveraged against the possible punishment, such facts are not present here. The detectives told Kennedy twice that his case was going to end up in court, and they made no misrepresentations of law or offers constituting a reduction in sentence or charges. After Kennedy confessed verbally, he asked Detective Dix if he could get counseling. Detective Dix answered that there were "plenty of systems to get help". Kennedy's written confession which followed, added no substantial incrimination beyond the prior confession.

{¶ 28} Although the detectives misrepresented to Kennedy that they had spoken with the other girls, the use of deception does not make an interview coercive and does not necessarily violate due process. *State v. Steele*, Slip Op. No. 2013-Ohio-2470, ___ N.E.2d ___, ¶ 22, citing *State v. Wiles*, 59 Ohio St.3d 71, 81, 571 N.E. 2d 97 (1991).

{¶ 29} In considering motions to suppress we defer to the trial court's findings of fact. When a trial court rules on motions to suppress, it "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994), citing *State v. Clay*, 34 Ohio St.2d 250, 298 N.E.2d 137 (1973). As a result, when we review suppression decisions, "we are bound to accept the trial court's findings of fact if they are

supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.* at 592-593.

{¶ 30} The facts of this case, as determined by the trial court, do not include threats, improper promises, or inducements as alleged by Kennedy. Furthermore, we have viewed Kennedy's interview and conclude that the factual findings of the trial court are supported by the record. We agree with the trial court that Kennedy's *Miranda* waiver was valid, and the totality of the circumstances support the voluntariness of Kennedy's statements to the police.

{¶ 31} For the foregoing reasons, we overrule the First Assignment of Error.

IV. Did the Trial Court Abuse its Discretion

in Overruling Kennedy's Motion to Withdraw his Plea?

{¶ 32} Kennedy's Second Assignment of Error states that:

The Trial Court Abused Its Discretion in Overruling Kennedy's Motion to Withdraw His Plea.

{¶ 33} Under this assignment of error, Kennedy contends that the trial court erred and abused its discretion in refusing to allow Kennedy to withdraw his plea. In this regard, we note that Kennedy asked for a continuance of the sentencing and his attorney, David Stenson, asked to withdraw as counsel. The trial court appointed new counsel, and held a hearing prior to sentencing. Both Kennedy and Attorney David Stenson testified at the hearing.

{¶ 34} Kennedy testified that he wanted to withdraw his plea because he felt that Attorney Stenson had pressured him into entering a plea. In addition, Kennedy stated that he

believed Stenson did not have his best interests in mind, was not willing to go to trial, was not willing to present a defense, and was not willing to fight for Kennedy's case. Attorney Stenson's testimony contradicted Kennedy's in every material respect. Stenson's testimony was also corroborated by Deputy Elizabeth Jerome. After hearing the testimony, the trial court found Stenson and Jerome's testimony more credible.

{¶ 35} The general rule is that motions to withdraw a plea of guilty or no contest should be freely and liberally granted. However, "a defendant does not have an absolute right to withdraw a plea before sentencing." *State v. Xie*, 62 Ohio St.3d 521, 527, 584 N.E.2d 715 (1992). A defendant has the burden of demonstrating that "there is a reasonable and legitimate basis for the withdrawal of the plea." *Id.* "A mere change of heart" does not provide adequate justification. (Citation omitted.) *State v. Lambros*, 44 Ohio App.3d 102, 103, 541 N.E.2d 632 (8th Dist.1988).

{¶ 36} In *State v. Peterson*, 7th Dist. Mahoning No. 06-MA-70, 2007-Ohio-6917, the Seventh District Court of Appeals outlined the following factors that are weighed in considering presentence motions to withdraw a plea:

"(1) whether the state will be prejudiced by withdrawal, (2) the representation afforded to the defendant by counsel, (3) the extent of the Crim.R. 11 plea hearing, (4) the extent of the hearing on the motion to withdraw, (5) whether the trial court gave full and fair consideration to the motion, (6) whether the timing of the motion was reasonable, (7) the reasons for the motion, (8) whether the defendant understood the nature of the charges and potential sentences, (9) whether the accused was perhaps not guilty or had a complete

defense to the charge." *State v. Cuthbertson*, 139 Ohio App.3d 895, 898-899, 2000-Ohio-2638. *Peterson* at ¶ 7.

**{¶ 37}** The Seventh District Court of Appeals further noted that:

No one of these factors is conclusive. When looking at the ninth factor, "the trial judge must determine whether the claim of innocence is anything more than the defendant's change of heart about the plea agreement." *State v. Kramer*, 7th Dist. No. 01-C.A.-107, 2002-Ohio-4176, ¶ 58. (Citation omitted.) *Peterson* at ¶ 7.

**{¶ 38}** In the case before us, the trial court considered the *Cuthbertson* factors in its order overruling the motion to withdraw Kennedy's plea. The trial court found that the State would be prejudiced because a number of witnesses, including five very young children, had been released from their subpoenas and had attempted to put the incident behind them.

**{¶ 39}** The trial court further determined that Attorney Stenson was well-respected and had provided the Defendant with excellent representation. In addition, the court found that Kennedy had been well-represented at the Rule 11 change of plea hearing and motion to withdraw pleas hearings, that both procedures were thorough, and that Kennedy's rights had been protected. The court also found that Kennedy knew and understood the nature of the charges and the sentence that would be imposed.

**{¶ 40}** According to the trial court's findings, there is no evidence to corroborate Kennedy's claims of innocence compared to evidence that includes his written confession, Jerome's corroboration of Stenson's testimony, and the fact that Kennedy shares the same sexually-transmitted disease as two of the minor victims. The trial court found that Kennedy

simply had a change of heart.

{¶ 41}    In addition to these trial court findings in the State's favor, we find that the trial court gave full and fair consideration to the motion.   In Kennedy's favor, we find that the timing of the motion was reasonable and the prejudice to the State was minimal. However, the trial court did not abuse its discretion in determining that the majority of the factors and their relative values weighed against granting the motion.

{¶ 42}    "The decision to grant or deny a presentence motion to withdraw a guilty plea is within the sound discretion of the trial court."  *Xie*, 62 Ohio St.3d at 521,584 N.E.2d 715, paragraph two of the syllabus.   The trial court abuses that discretion when its ruling is " 'unreasonable, arbitrary or unconscionable,' which is 'more than an error of judgment.' " *Peterson*, 7th Dist. Mahoning No. 06-MA-70, 2007-Ohio-6917, at ¶ 8, quoting *Xie* at 527.

{¶ 43}    After reviewing the evidence, we conclude that the trial court did not abuse its discretion in overruling Kennedy's motion to withdraw his pleas of no contest.   Accordingly, Kennedy's Second Assignment of Error is overruled.

V.   Conclusion

{¶ 44}    All of Kennedy's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN and FROELICH, JJ., concur.

Copies mailed to:

Mathias H. Heck
Carley J. Ingram
Lucas W. Wilder
Hon. Barbara P. Gorman